## Case No. 8,855.

### McKENZIE et al. v. ANDERSON.

[2 Woods, 357.] [1]

Circuit Court, S. D. Georgia. April Term, 1873.

EXECUTOR—BORROWING FROM ESTATE — INTEREST CHARGEABLE—MALADMINISTRATION—LOSS FROM VIS MAJOR—CONFEDERATE MONEY.

1. Where a trustee and executor, in entire disregard of the directions of the will, takes funds of the estate and treats himself as the borrower, he must be charged with the highest amount of interest allowed by the law. He is personally and absolutely responsible for the fund.

2. Mode of adjustment of accounts of executor and trustee, in case of maladministration.

3. For such public and national calamities as war, foreign or civil, and the vicissitudes of fortune which attend them, no individual, who does not incite them, is responsible.

4. An executor is not responsible for the loss of the funds received by him for dividends in Confederate money or notes, which, at the time, he was obliged to accept.

This was a bill filed by the legatees of William J. Scott, residing in Great Britain, against [G. W.] Anderson, the executor, for an account, and for a change of trustee. William J. Scott, a resident of Savannah, Georgia, was possessed of a considerable real and personal estate in said city, and made his will, dated October 6, 1823, and a codicil thereto, dated June 4, 1829, by which, after constituting the defendant and others as executors and trustees, he devised and bequeathed to them all his estate in trust: First, to convert the same into money unless invested in good mortgages or government funds, and with the proceeds to pay his debts and funeral expenses; secondly, to invest the residue in the public stock or funds of Great Britain, the United States, or any individual states, or any municipal corporation, or in the capital stock or shares of any chartered bank, or upon real estate, as they might in their discretion think proper; thirdly, fourthly, etc., to pay one-half the income and profits of said estate to his daughter Elizabeth (one of the complainants, wife of William McKenzie), during her life; and after her death, the said half of his estate to such child or children of either of his daughters, or their issue, as his daughter Elizabeth should by will appoint; and to pay the other half of said income and profits to his daughter Kezia

now deceased, the mother of the other complainants, for her life; and after her decease, to pay the said half of his estate to such child or children of either of his daughters as his daughter Kezia should by will appoint; and if either daughter should die intestate, then to pay and divide her moiety to and among her children and their issue, if any, share and share alike. The testator further empowered his executors to call in any debts or securities which to them might appear unsafe or insecurely invested, and to invest the same or the proceeds thereof according to the directions before given. The testator died in 1830, and the defendant proved the will on the 3d day of November in that year, and took possession of the estate, amounting, as stated by the bill, in real estate, to the value of $24,000, and in personal estate to $48,323.20. The bill further stated the marriage of the daughters, Elizabeth, to William McKenzie, and Kezia, to Richard R. Manson; and the death of Kezia intestate, leaving her surviving the complainants, Richard R. Manson and Elizabeth R. Gordon, there being then no other children of either of said daughters of the testator, nor any children's children. The bill charges that large sums of money came into the executor's hands, which he failed to invest as directed by the will, but applied the same to his own use; that he has failed to pay over the interest as directed; that he invested large sums in Confederate States bonds, which he had no right to do; that he continued to keep a large amount invested in the stock of a banking corporation, to wit: the Planters' Bank, of Georgia, of which he was president, the assets of which were used for the benefit of the Confederate States government, whilst it was his duty to have changed said investment; and the failure to do so resulted in a great loss to the estate; that he kept large balances in his hands which he might have invested, and so lost the interest thereof, and then invested the same in Confederate bonds, which became worthless. Other delinquencies are charged which it is not necessary to specify.

The answer stated that the real estate sold for only $21,000, and that the personal estate was appraised at $45,895, a copy of the inventory being annexed to the answer. The answer further stated that of this amount, the sum of $3,497.96 was decreed to be the property of the two children and was paid over to them, and that certain other items did not produce the amount of the appraisement. The defendant appended to his answer a copy of his whole account from 1830, down to the time of filing the bill, and this account furnished the materials from which, with the aid of some further extraneous evidence, a satisfactory disposition of this case could be made. He admitted, and his accounts and testimony showed, that he received large amounts of money belonging to the corpus of the estate, arising from the sale

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

of lands and other sources, which he loaned out on personal security, without investing the same as directed by the will. But he contended that he paid over the interest thereof, and that they were loaned out at greater profit in that way, than they could have been in any other manner. He admitted that on the 9th day of June, 1863, he invested the sum of $23,000 in Confederate States bonds, and on the 15th of January, 1864, the further sum of $1,010 in like securities; that this was money received by him in Confederate treasury notes for loans then due, part of the corpus of the estate, which he was authorized to receive in this form by a statute of Georgia; and that the purchase of the bonds was sanctioned by an order of the superior court of Chatham county, Georgia, made in May term, 1863; and that he still held the said bonds. He further stated that from and after the year 1861, all the rents, issues and income of the estate were received in Confederate treasury notes—a part of which were in his hands. He further stated that from 1864 to 1866 there was no income which came to his hands, and only a few hundred dollars thereafter, of which he gave a detailed statement. He admitted that he invested largely, to the extent of 244 shares, in the Planters' Bank of Georgia, of which he was president, and could not, in his judgment, have made a better investment. He admitted that said bank made large loans to the Confederate States of America, of which he gave a list; but said that it was forced to do so by law and public opinion. He denied that the failure of the bank was due to these loans; but insisted that it was caused by the statute of Georgia which compelled the bank to receive the treasury notes of Georgia and the Confederate States in payment of all dues to the bank. By an amended answer he said that the Confederate bonds purchased by him were not purchased from the government, but from private individuals in the market.

Upon this bill and answer the matter was referred to a master, who made a long report to which both parties excepted; and it was upon these exceptions that the case was heard.

H. R. Jackson, for complainants.

T. E. Lloyd and W. S. Chisholm, for defendants.

BRADLEY, Circuit Justice. It appears from the master's report and from the defendant's accounts and evidence, that the $23,000 invested in Confederate States bonds was a sum of money, part of the corpus of the estate which had accumulated in the defendant's hands many years before, as far back as 1840, and had been accumulating several years before that time, and which he had never invested in accordance with the directions of the will; but which, he alleges, he loaned out from time to time to individuals on their personal security, and which

was all paid in Confederate treasury notes in 1863. It further appears that the balance of the estate had been invested by the defendant in bank stock of the Savannah Bank, including a few shares of railroad stock; that these investments commenced soon after the commencement of the trust, and were continued from time to time as funds came into his hands from the sale of lands and other sources. In 1840, these investments stood as follows: bank stocks and railroad stocks whose par value was $47,400, and which had cost the trust fund the sum of $44,958. These investments remained unchanged down to the time of filing the bill in this case. In 1848, on occasion of receiving an extra dividend of $1,600 from the Marine Bank, the amount was invested in thirty-two additional shares in said bank. One complaint made by the complainants is, that these investments should have been changed when the Civil War rendered them precarious. With the exception of the railroad stock, they are now a total wreck and loss. The $23,000 was an additional amount which the executor retained in his hands, and which he alleges that he loaned out on personal security as before mentioned. His accounts contain annual credits of interest for moneys loaned, which he says were the moneys in question. These credits are always in a single sum, and from the year 1848 down to the period of the war, they were invariably the sum of $1,489.25. From 1842 to 1847 inclusive, they were $1,540. Prior to 1842, they were for less sums according to the amount which the defendant contends was thus lent out on personal security. These several sums prior to 1848 were just the amount of 7 per cent. on certain round sums of principal.

Now with regard to this account, the complainants contend: 1. That the defendant never gave credit for interest on the full amount remaining in his hands. 2. That, instead of simple interest, he ought to be charged with compound interest on the amounts actually remaining, or that ought to be, in his hands, because, as they contend, he used this money himself, and is guilty of gross misconduct and breach of trust in not investing it pursuant to the directions of the will. 3. That he ought to be charged with eight per cent. instead of seven per cent. up to 1846. But the accounts further show that in addition to the standing sum of $23,000, for which the executor allowed annual interest, an additional amount gradually accumulated in his hands over and above his remittances to the legatees.

These accumulations increased from $22.52, in 1843, to $21,278.21 in 1864. There was a sudden increase of this balance in 1851, from $2,794.78 to $6,454.11, and it rose in 1855 to as high as $20,000, but was reduced back in 1859 to $3,000. The cause of this is explained to be, that in 1850 Mrs. Manson, one of testator's daughters, died; and the executor says that no one appeared with proper au-

thority to receive her portion of the income, and. therefore, he was obliged to keep it in his hands, ready at any moment to be paid over; and that when Mrs. Manson's children came of age he paid over to them the income belonging to them, which they received at his hands. He insists that they are now precluded from making any objections to the course pursued by him. The complainants insist that he ought to account for the interest on these balances. After 1861, it will be observed that the balance grew rapidly, till in 1864, it reached the amount of $21,278.21. The defendant says that the existence of the war and the blockade·prevented him from making any remittances; and that he was obliged to receive the income during this period in Confederate state moneys and securities, in which he now has the said final balance on hand. As before stated, the complainants insist that the bank stock ought to have been disposed of and changed into some safe investment; and that the $23,000 ought not to have been invested in Confederate securities; but that' the defendant is·responsible for it on several grounds.

These are the principal facts and points in the case. The conclusions to which the master came, and which appear in his report, were: 1. That the defendant was not bound to change the investments of bank stock. 2. That he is responsible for the·sum of $23,075, to be charged against him in 1863, in gold, with simple interest, and that he cannot claim credit for the investment of that sum in Confederate securities. 3. That he is chargeable with simple interest on the amounts of income of the moiety of the estate belonging to Mrs. Manson's children, whilst they remained in his hands. 4. That the dividends from stocks received by him in Confederate money should be "scaled down" according to Barber's Table, and that the balance of the account. when so amended, should be charged against the defendant.

By a· supplementary report, the master states that on reflection he concludes that the defendant should not be charged at all with the dividends which the banks had paid him in Confederate money, because it was not his fault that such currency was paid to him; and that the evidence shows him to be still in possession of such notes so paid him.

Without going largely into the reasons which have influenced my judgment in this matter, I will proceed to state the conclusions to which I have come. I think the defendant is chargeable with the balances of principal money in his hands, from 1832 down to 1861. as for money used by him for his own purposes. The amount of interest annually credited by him was always invariably seven per cent. on a certain amount for the entire year. For several years, it was on $10,000, $12,000, $16.000, $18,000, and $20,-00; for many years in succession, it was on precisely $22.000; and for more than twenty years, in succession it was seven per cent. on

$23,000, less seven and one-half per cent. commissions. Now is it credible that these precise amounts were kept out on loan at precisely seven per cent. for precisely the entire year? It is impossible to think so. The defendant evidently charged himself with seven per cent. on the amount which he chose to regard as the proper amount to be out on interest. This was nothing else than borrowing the money himself. He treated himself as the borrower. What he did with the money does not appear, except from his general allegation that he lent it out. He cannot, when under oath, remember a single person to whom he lent it. It is manifest that he took it for his own use, on his own responsibility, and at his own risk. And he certainly did so in entire disregard of the directions of the ' will. He may not have meant wrong personally. He may have allowed to the legatees all the interest that he realized himself; nay, he may have allowed them more than he realized. He clearly did not account to them for what he did realize. It is impossible that his loanings and turnings of the money could have exactly produced just that uniform sum every year. His own accounts prove most conclusively that he used the money himself. He may have loaned it out to others; but where is the account of those transactions? They were never rendered. They were never kept. Under such circumstances the presumption must be taken most strongly against him. He must be charged with the highest amount of interest allowed by the law; and the secret deduction of seven and one-half per cent. for commissions must be disallowed. The rate of interest to be charged, therefore, will be, according to the decisions of the courts of this state, eight per cent. down to January 1, 1846, and seven per cent. from that date to 1863. The law, it is true, says six per cent. compound interest after January 1, 1854; but the executor concedes that he made seven per cent. with the money, and he must be charged at that rate. It follows as a necessary corollary to this view of the case that the executor is personally and absolutely responsible for this fund. It is a debt due from him to the trust fund. No inquiry need be made as to the regularity of the investment of the $23.000 in 1863. That investment cannot avail the executor in the least. By his own breach of trust, the money, if belonging to the estate at all, was lying around on personal security in temporary loans. But it did not belong to the estate; it belonged to him. He had made himself the borrower of it; and, under those circumstances, he cannot discharge himself by procuring such securities as Confederate bonds, in a time of civil war, the fate of which was to decide whether they were worth any thing or not.

In reforming the account upon the principles which I have stated. I do not deem it necessary to assume different balances of principal on which to calculate interest from

those on which the executor allowed it prior to 1840. It will only be necessary to charge him with the additional one per cent. on the sums which he admits were at interest. He was entitled to some little margin on his balances, to allow him time to make investments. And, upon a careful examination of the account, I do not find that the actual balances prior to 1840 much exceeded the amounts on which he allowed interest in the account. From 1840 to 1847, inclusive, he ought to be charged with interest on $23,000 instead of $22,000; for that amount was in his hands during that period. After 1847, he should be charged with the full seven per cent. on $23,-000, without deducting the seven and one-half per cent. commissions, and no commissions are to be allowed on the excess of interest to be accounted for. The excess of interest to be thus charged in reforming the account should be compounded, with annual rests, at the rate of seven per cent. per annum, down to January 1, 1854, and at the rate of six per cent. per annum after that time; and the accounting is to be brought down to the present time; for the executor still owes this money. I do not deem it necessary to state the account on a specie basis, as distinguished from legal currency. Compound interest must be allowed on the recognized principles applicable to such cases as the present. The language of the supreme court of this state in Fall v. Simmons, 6 Ga. 272, aptly expresses the general law on this subject: "Liability to pay simple interest is the rule, compounding is the exception. If the trustee applies the fund to his own benefit in trade, or sells trust stocks and applies the proceeds to his own use, or refuses to follow the directions of the deed creating the trust. as to investments, or conducts himself fraudulently in the management of the funds, and in all other instances depending upon like principles, chancery will direct the compounding of the interest." See, also, Williams, Ex'rs (Ed. 1859) p. 1676, and note. I do not think that the act of 1847 (Cobb, New Dig. 336) is intended to control the operation of equity in such cases. It is the object of that statute to lay down the rule that shall govern the question of interest in ordinary cases. The court is asked to disallow the ordinary commissions of two and one-half per cent. charged by the executor in his accounts. This I do not think we are called upon to do. The general management of the estate by the executor, independent of the $23,000, has been successful and productive of a generous income. Whilst the court has the power to disallow this item in cases of misconduct, the circumstances of the case do not, in my judgment, call for it.

When the account has been thus reformed, it will appear that the balances of interest accumulated in the executor's hands from 1843 to the breaking out of the Civil War were larger than is shown by the accounts. These balances at one time, after the death of Mrs. Manson, grew to be very large, and the complainants ask that the executor may be charged with interest upon them. He, on the contrary, insists that he had to keep the money ready to be paid over at any time when a person should come forward with the proper authority to demand it. The executor knew precisely what the difficulty was, and that no person could be qualified to receive the money until the children came of age, without getting letters of guardianship in this state, of the application for which he, as the agent of the parties, would receive timely information. To pretend that he would have subjected himself to any peril in putting the money out at interest seems absurd. If he had opportunities, as he says he had, for lending out $23,000 of the corpus of the fund, without hazard that he was not willing to assume, he surely could have loaned out the $15,000 to $20,000 of accumulated interest. But he need not have loaned it out on mere personal security; he could have loaned it out on call, or on call with reasonable notice, upon securities abundantly safe, and was under no necessity of, and had no sufficient excuse for keeping such a large amount of money, belonging to minors, entirely idle and unproductive. I think he must be charged with simple interest, at six per cent., on the balances of interest due to the Manson family, year by year, up to 1858, inclusive, when he paid over the bulk of the accumulation to the children of Mrs. Manson. That amount was due to them, and should have been paid them. Simple interest at six per cent. per annum should be charged upon the aggregate amount from January 1, 1859, to the present time. That amount, at least, could have been realized on temporary loans. It is a debt due from the executor to the Manson children, and has never been discharged. I do not deem it necessary to charge him with compound interest on this item. because the children themselves have neglected to claim it. But I cannot regard their laches in not claiming it, or their acquiescence in the receipt of what the executor saw fit to pay them, as estopping them from claiming it now, either on the ground of the statute of limitations or any other ground. The very meagre accounts which the executor was in the habit of rendering to the legatees, consisting of mere aggregate sums of receipts and expenditures for the year, conveyed them no information which ought to stop their mouths with regard to the accuracy of the accounts, or to charge them with sleeping over their rights.

I would only observe in addition, that the amount of income in the executor's hands, due and payable before the commencement of the war, became a personal debt, and he is responsible therefor. Whatever the balance may have been at the close of the year 1860, less the two sums of $1,496.34 and $2,-809.77, remitted in January and May, 1861, will be charged to the executor.

The only remaining question relates to the alleged neglect of the executor to change the investments of bank stock on the breaking out of the war. I do not think that he is chargeable with negligence on this score. The investment was authorized by the will. Indeed, some of the stock now held belonged to the testator himself at the time of his death. For such public and national calamities as war, foreign or civil, and the vicissitudes of fortune which attend them, no individual, who does not incite them, is responsible. And in the midst of the public alarm and disorder consequent thereon, no man, however prudent, can be expected to forecast what is best or most expedient to be done with property or investments, his own or those which he holds in trust. All property, all human interests, nay, life itself, is bound up in the national destinies which decide the fate or control the prosperity of the country in which it is situated or enjoyed. Whatever is at stake therein must abide by this law. No human foresight or sagacity can provide against the vicissitudes to which the human race itself is subject. Where was the man in 1861 to tell the executor what he should do, or what was most wise to be done? Was it his duty to emigrate from the country, or to send the property in his charge out of it? No one will contend for such an absurd proposition. For, to what country should he go, which might not be subject to the same convulsions? Considerations of like character exonerate him from responsibility for the dividends received on the stock. What he received, he must account for—nothing else. It is contended that he ought to have converted the Confederate funds received by him for dividends into gold or exchange, and to have transmitted them to the legatees. I do not think he was bound to attempt this. The perils were too great. He would have been chargeable with negligence had a loss occurred thereby. If anything could have been done by him more prudent than he did do, it might, perhaps, have been, to purchase gold and keep it on hand, or to invest in stocks or property. But where was the security of his keeping possession of gold? And in what securities or property could he have invested which were not exposed to loss or destruction?

Without attempting, therefore, to decide the delicate questions arising on the laws passed in 1861 and 1863, authorizing executors and trustees to invest in Confederate securities and to receive Confederate funds, which I think are to be regarded as valid and binding where they do not conflict with the savings and reservations of the constitution of 1868, I do not hold the executor responsible for the loss of the funds received by him for dividends in Confederate money or notes, which he was obliged to accept at the time. A decree will be made in conformity with this opinion, and a new trustee appointed.